*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MELISSA GAYLE SCHOENHEIDE,

        Plaintiff-Appellant,

v

LEE SHAW,

        Defendant-Appellee.

UNPUBLISHED
October 20, 2022

No. 360568
Wayne Circuit Court
LC No. 15-101104-DM

Before: RICK, P.J., and O'BRIEN and PATEL, JJ.

PER CURIAM.

In this custody dispute, plaintiff appeals as of right the trial court's opinion and order awarding defendant sole physical and legal custody of the children: VS,[1] LAS, and KDS. We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This lengthy and acrimonious custody dispute began when plaintiff filed for divorce in 2015. Later that year, the parties agreed to a consent judgment of divorce (CJOD), which provided shared legal custody of the children and made plaintiff their primary physical custodian. Almost immediately afterward, however, the parties began to relitigate various issues supposedly settled in the CJOD. By April 2016, defendant moved to modify the custody provisions in the CJOD. For reasons not clear from the lower court record, the trial court delayed issuing a decision on defendant's motion until April 2019, at which time the parties agreed to a consent order to settle the matter. The consent order maintained shared legal custody, but provided defendant with equal

---

[1] During this litigation, VS came out as transgender. In an effort to avoid confusion and respect VS's wishes, we will only refer to VS using his preferred initials and pronouns. Additionally, because VS turned 18 and graduated high school while this appeal was pending, he is no longer subject to the custody order being appealed. Consequently, this opinion will only discuss the facts related to VS when necessary for a full understanding of the case.

parenting time and shared physical custody. The order also provided for the appointment of a parenting coordinator under MCL 722.27c.

Once again, however, the parties' apparent agreement almost immediately evaporated. For instance, it took seven months for Parenting Coordinator Jordana Wolfson to be appointed to the case due to the parties' inability to agree upon a parenting coordinator. When finally appointed, Parenting Coordinator Wolfson was required to immediately settle a variety of disputes, like issues concerning plaintiff's parenting time with VS, LAS's transportation to and from soccer events, KDS's participation in Cub Scouts, payment of tutoring costs, and LAS's decision about which high school to attend. Needless to say, the record establishes that the parties could not agree on most issues, even minor ones.

In August 2020, defendant again moved to modify custody. This time, defendant sought sole legal and physical custody of the minor children. The trial court appointed a guardian ad litem (GAL) to participate in the case in advance of the pending evidentiary hearing. Before the July 2021 evidentiary hearing, the trial court decided several pretrial issues raised by the parties. Pertinent to this appeal, the trial court granted defendant's motion in limine to preclude plaintiff from calling witnesses at the evidentiary hearing because of her failure to timely file a witness list. In addition, the court denied plaintiff's motion in limine to preclude documentary evidence and testimony from Parenting Coordinator Wolfson. During the five-day evidentiary hearing, the trial court heard testimony and evidence from defendant; Parenting Coordinator Wolfson; Katherine Zopf, who was defendant's wife; the GAL; and plaintiff.

After a significant delay, the trial court issued a 76-page opinion and order modifying the April 2019 consent custody order. The trial court found by clear and convincing evidence that the best-interests of the children favored granting defendant sole legal and physical custody. Plaintiff moved for reconsideration, which the trial court denied. This appeal followed.

II. DEFENDANT'S MOTION IN LIMINE

Plaintiff first argues the trial court abused its discretion and violated her right to due process by granting defendant's motion in limine to preclude her from calling witnesses at the evidentiary hearing as a discovery sanction. We disagree.

A. STANDARD OF REVIEW

"We review for an abuse of discretion the trial court's decision regarding whether to impose discovery sanctions." *Elahham v Al-Jabban*, 319 Mich App 112, 135; 899 NW2d 768 (2017). A trial court abuses its discretion if its decision falls outside the range of reasonable and principled outcomes. *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010). "We review de novo matters of statutory interpretation and constitutional issues." *LeFever v Matthews*, 336 Mich App 651, 661; 971 NW2d 672 (2021).

B. DISCOVERY SANCTION

On appeal, plaintiff argues that the trial court's discovery sanction was an abuse of discretion because it was too severe, and that she is entitled to a new evidentiary hearing where

the trial court can consider all of the available testimony and witnesses, not just those favorable to defendant.

Under MCR 3.201(C), "practice and procedure in domestic relations actions is governed by other applicable provisions of the Michigan Court Rules," except for specific exemptions not relevant here. MCR 2.401(B)(2)(a)(*vi*) states that "at [a] time [] the court concludes [that a scheduling] order would facilitate the progress of the case, the court shall establish times for events and adopt other provisions the court deems appropriate, including . . . the exchange of witness lists under" MCR 2.401(H)(2)(h). Under MCR 2.401(H)(2)(h), a party's witness list must identify lay and expert witnesses who will "be called unless reasonable notice is given that they will not be called," and those who "may be called . . . ." When entering such orders, the court rules require the trial court to "take into consideration the nature and complexity of the case, including the issues involved, the number and location of parties and potential witnesses, including experts, the extent of expected and necessary discovery, and the availability of reasonably certain trial dates." MCR 2.401(B)(2)(b).

The court rules also address possible sanctions for failing to abide by the trial court's orders with respect to witness lists. Under MCR 2.401(I)(2), if a party does not provide a witness list within the time identified by the trial court's order, "[t]he court may order that any witness not listed in accordance with this rule will be prohibited from testifying at trial except upon good cause shown." The trial court's exercise of discretion to prohibit witnesses from testifying was addressed by this Court in *Duray Dev, LLC v Perrin*, 288 Mich App 143, 164-165; 792 NW2d 749 (2010):

> Once a party has failed to file a witness list in accordance with the scheduling order, it is within the trial court's discretion to impose sanctions against that party. These sanctions may preclude the party from calling witnesses. Disallowing a party to call witnesses can be a severe punishment, equivalent to a dismissal. But that proposition does not mean that disallowing witnesses is always tantamount to a dismissal. Nor does it mean that a trial court cannot impose such a sanction even if it is equivalent to a dismissal. Because the decision is within the trial court's discretion, caselaw mandates that the trial court consider the circumstances of each case to determine if such a drastic sanction is appropriate. The record should reflect that the trial court gave careful consideration to the factors involved and considered all of its options in determining what sanction was just and proper in the context of the case before it. Relevant factors can include, but are not limited to,
>
> > (1) whether the violation was wilful or accidental; (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses); (3) the prejudice to the defendant; (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice; (5) whether there exists a history of plaintiff's engaging in deliberate delay; (6) the degree of compliance by the plaintiff with other provisions of the court's order; (7) an attempt by the plaintiff to timely cure the defect; and (8) whether a lesser sanction would better serve the interests of justice. This list should not be considered exhaustive.

The trial court should also determine whether the party can prove the elements of his position based solely on the parties' testimony and any other documentary evidence. [Quotation marks and citations omitted.]

In this case, the trial court entered a scheduling order for the evidentiary hearing on June 7, 2021. The order begins with a warning to the parties, in all capital letters, "FAILURE TO COMPLY WITH ANY DEADLINES IN THIS ORDER SHALL BE DEEMED GOOD CAUSE TO ENTER A DEFAULT OR DISMISS THE PENDING MATTER(S) (MCR 2.504) AND/OR IMPOSE ANY AND ALL SANCTIONS OUTLINED IN THE MICHIGAN COURT RULES." The scheduling order states that the final settlement conference would take place on June 29, 2021, and all parties and their counsel were required to be present. The parties' witness lists were required to comply with MCR 2.401(I), and had to be filed with the trial court and served on the opposing party "no later than fourteen (14) days prior to the trial or the final settlement conference, whichever occurs first." The scheduling order also addressed adjournment of the deadlines within it, noting that such could only be granted by agreement of the parties or an order of the court.

There appears to be no legitimate dispute that the scheduling order clearly required witness lists to be filed and served on the opposing party by June 15, 2021, which was 14 days before the final settlement conference. There also appears to be no dispute that plaintiff did not meet this deadline, did not seek defendant's concurrence in extending the deadline, and did not move the trial court for an adjournment of the deadline. As a result, plaintiff violated the trial court's scheduling order by failing to file and serve a witness list by June 15, 2021. Defendant did not file a motion in limine to preclude plaintiff from calling witnesses until June 22, 2021, at which time plaintiff still had not filed or served a witness list.

Plaintiff's only stated reason for the lack of a witness list is that she was waiting for discovery responses before filing her list. Plaintiff insists that, without adequate discovery responses, she could not possibly determine which witnesses she would call for trial. These arguments clearly lack merit.

Plaintiff admits that she knew of at least one witness in her favor, her expert witness, Dr. Wooten. Given the lengthy history and acrimonious nature of this case, plaintiff cannot seriously contend that any witnesses from her family or friends who would have supported her case were not known to her by June 15, 2021. In response, plaintiff emphasizes that she was required to submit a "final" witness list, and contends that she could only do so when discovery was completed. This ignores that the court rules specifically contain a provision for a party to list a witness without being required to call said witness. MCR 2.401(H)(2)(h). It follows that plaintiff could have listed potential witnesses on June 15, 2021, and, after receiving discovery responses, simply not called any witness who plaintiff believed would be unhelpful. Plaintiff has provided no explanation for her failure to prepare a list of witnesses she knew would be in her favor, such as her family members and friends, along with a list of those witnesses she might later determine should not be called after reviewing their discovery responses. Accordingly, regardless of any confusion over the scheduling order's provisions about discovery, the order was unambiguous when it established a deadline for filing and serving witness lists, and the court rules otherwise provided a specific avenue to deal with the problems identified by plaintiff. We further note that the trial court's own scheduling order provided that plaintiff could either move to extend the deadline or seek a stipulated extension from defendant. Yet plaintiff did none of these things and,

-4-

thus, violated the trial court's scheduling order. "Once a party has failed to file a witness list in accordance with the scheduling order, it is within the trial court's discretion to impose sanctions against that party." *Duray Dev*, 288 Mich App at 164.

Plaintiff next argues that the trial court's decision to preclude her from calling witnesses in response to her failure to file a witness list was equivalent to a dismissal or default judgment as contemplated in *Duray Dev*, 288 Mich App at 164, but she is incorrect. There are, of course, many cases in which the inability to call witnesses or otherwise present favorable evidence will qualify as an effective dismissal. See, e.g. *Dean v Tucker*, 182 Mich App 27, 31; 451 NW2d 571 (1990) (explaining that the discovery sanction of barring an expert witness's testimony led directly to the trial court's award of summary disposition to the opposing party). In this case, though, defendant bore the burden of proving that a change of custody was in the best interests of the minor children, meaning that plaintiff was able to defeat defendant's motion simply by adequately challenging defendant's witnesses and evidence through cross-examination. As such, the trial court's discovery sanction precluding plaintiff from calling witnesses was not an effective dismissal.

Plaintiff contends that the trial court's sanction was nevertheless an abuse of discretion because the court failed to consider all of the various factors listed above before imposing the sanction. *Duray Dev*, 288 Mich App at 164-165. It is undisputed that the trial court's opinion and order regarding defendant's motion in limine did not address all of the factors listed above. As related to this case, though, such was not an abuse of discretion. Plaintiff's argument relies on her belief that the trial court's sanction was an effective dismissal, which it was not, as discussed above. This Court has held that a failure to consider all of the factors on the record was inherently an abuse of discretion only in cases where the sanction was dismissal. See, e.g., *Grimm v Dep't of Treasury*, 291 Mich App at 140, 150; 810 NW2d 65 (2010) (quotation marks and citation omitted; emphasis added) ("*When considering the sanction of dismissal*, the record should reflect that the Tax Tribunal gave careful consideration to the factors involved and considered all its options in determining what sanction was just and proper in the context of the case before it."); *Vicencio v Jamie Ramirez, MD, PC*, 211 Mich App at 501, 506-507; 536 NW2d 280 (1995) ("Dismissal is a drastic step that should be taken cautiously, . . . [and] [b]efore imposing such a sanction, the trial court is required to carefully evaluate all available options on the record and conclude that the sanction of dismissal is just and proper."); *Gueye v State Farm Mut Auto Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2022); (Docket No. 358992), slip op at 12. We further note that defendant's motion in limine specifically requested that plaintiff be disallowed from calling witnesses due to her failure to submit a witness list, and in response, plaintiff (1) did not assert that the trial court was required to discuss any factors before granting the relief defendant requested, (2) did not specifically cite to caselaw regarding those factors, and (3) provided little analysis other than to claim that the sanction was too harsh. In issuing its decision, the trial court addressed plaintiff's claim of harshness, explaining that the sanction imposed was not overly harsh because plaintiff was still able to cross-examine defendant's witnesses and defend against his claim for custody. In light of the facts that the sanction requested and imposed did not effectively dismiss plaintiff's claim and that the trial court appropriately addressed plaintiff's complaints with respect to the requested sanction, we conclude that the trial court's sanction did not amount to an abuse of discretion.

## C. DUE PROCESS

As noted, plaintiff also argues that the trial court's decision to preclude her from calling witnesses and introducing evidence infringed her due-process rights. "Due process is a flexible concept, the essence of which requires fundamental fairness." *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009). "[A]t a minimum, due process of law requires that deprivation of life, liberty, or property by adjudication must be preceded by notice and an opportunity to be heard." *CAJ v KDT*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 355433); slip op at 5 (quotation marks and citation omitted). "To comport with these procedural safeguards, the opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *CAJ*, ___ Mich App at ___; slip op at 5(quotation marks and citation omitted). The party must also be given the opportunity to "be heard before an impartial decision-maker . . . ." *Lake v Putnam*, 316 Mich App 247, 254; 894 NW2d 62 (2016) (quotation marks and citation omitted).

There is no dispute that plaintiff had a constitutionally recognized interest at stake and was thus entitled to due process before it could be deprived. Plaintiff does not dispute that she was provided adequate notice. She also does not claim on appeal that she was denied the right to be heard in front of an impartial decisionmaker. Instead, plaintiff's argument focuses on her inability to call witnesses, which she claims denied her an opportunity to be heard in a meaningful manner.

"The opportunity to be heard does not mean a full trial-like proceeding, but it does require a hearing to allow a party the chance to know and respond to the evidence." *Cummings v Wayne Co.*, 210 Mich App 249, 253; 533 NW2d 13 (1995). Plaintiff was permitted to participate in the five-day evidentiary hearing—she was able to cross-examine all of the witnesses about their testimony and the evidence they presented. Further, many of the documents filed as evidence contained plaintiff's version of events. For example, Parenting Coordinator Wolfson's recommendations included a summary of her contacts with plaintiff, which contained plaintiff's explanations for her behavior. Although plaintiff was barred from admitting evidence in the form of exhibits, she was permitted to impeach witnesses by questioning them with evidence undermining their testimony, which she did. Accordingly, there can be no serious dispute that plaintiff had a hearing and was permitted "to know and respond to the evidence." *Cummings*, 210 Mich App at 253.

Plaintiff's argument also ignores that her right to due process is limited to an opportunity to be heard in a meaningful manner, not an absolute right to be heard in the manner she deems most appropriate. *CAJ*, ___ Mich App at ___; slip op at 5. Plaintiff clearly had *the opportunity* to be heard in the manner she now deems most appropriate (i.e., being able to call witnesses and present evidence), but she divested herself of that opportunity by failing to follow the court's scheduling order. While there can be no dispute that plaintiff's ability to present her version of events to the trial court was limited, plaintiff has failed to show that her due-process rights were violated. In the simplest terms, the record shows that plaintiff was given notice and the opportunity to be heard in a meaningful time and meaningful manner before an impartial decisionmaker. As a result, her right to due process was adequately protected by the proceedings.

## III. PLAINTIFF'S MOTION IN LIMINE

Plaintiff next argues that the trial court abused its discretion by denying her motion in limine to preclude evidence and testimony from Parenting Coordinator Wolfson. We must disagree because plaintiff's argument on appeal fails to address all of the bases for the trial court's decision.

The trial court identified three independent reasons for denying plaintiff's motion in limine: plaintiff's "failure to: (1) comply with the requirements set forth in the 6/7/2021 Scheduling Order; (2) show good cause to preclude [Parenting Coordinator] Wolfson's testimony; and (3) timely file a motion in limine pursuant to the Court's 6/7/2021 Scheduling Order[2] . . . ." In her brief on appeal, plaintiff challenges the trial court's first two reasons—she insists that the scheduling order was inconsistent with the court rules and unable to be followed, and that Parenting Coordinator Wolfson's decision to disregard plaintiff's valid subpoena was good cause to bar Parenting Coordinator Wolfson's testimony and evidence. Plaintiff has not, however, presented any argument or reasoning with respect to the trial court's final reason, which was that plaintiff's motion in limine was not timely filed under the scheduling order. When an appellant fails to dispute the basis of the trial court's ruling, this Court need not even consider granting plaintiffs the relief they seek. *Derderian v Genesys Health Care Sys.*, 263 Mich App 364, 381; 689 NW2d 145 (2004). Accordingly, even if we were to agree with plaintiff's contentions related to the trial court's first two reasons, reversal still would not be warranted because plaintiff has not challenged the trial court's third valid reason for denying her motion.[3]

## IV. PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

Plaintiff next argues that the trial court's decision that there had been proper cause or a change of circumstances demonstrated since the previous custody order was legally and factually improper. We disagree.

### A. STANDARD OF REVIEW

MCL 722.28 provides that when reviewing a lower court order in a custody dispute, "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." This statute distinguishes among three types of rulings "and assigns standards of review to each." *Dailey v Kloenhamer*, 291 Mich App 660, 664; 811 NW2d 501 (2011) (quotation marks and citation omitted). The first type is factual findings, which "are reviewed under the 'great weight of the evidence' standard." *Id.* "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019). The second type is

---

[2] Plaintiff filed her motion in limine 16 days after pretrial motions were required to be filed under the scheduling order.

[3] Because plaintiff failed to address the trial court's reason for denying her motion in limine, we need not and will not consider the myriad of other arguments raised by plaintiff on this issue.

questions of law, which are reviewed for clear legal error. *Id.* "A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law." *Id.* (quotation marks and citation omitted). The third type is discretionary rulings, which are reviewed for a palpable abuse of discretion. *Dailey*, 291 Mich App at 664. "An abuse of discretion exists when the trial court's decision is palpably and grossly violative of fact and logic." *Id.* at 664-665 (quotation marks, citations, and alteration omitted).

## B. LAW AND ANALYSIS

The trial court did not err by concluding that there had been proper cause or a change of circumstances warranting review of the previous custody order.

In Michigan, the Child Custody Act, MCL 722.21 *et seq.*, " 'applies to all circuit court child custody disputes and actions, whether original or incidental to other actions.' " *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010), quoting MCL 722.26(1). When presented with a request to modify custody under the act, the trial court is permitted to consider the request only "if the movant establishes proper cause or a change in circumstances." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011), citing MCL 722.27(1)(c). Put differently, "a party seeking a change in the custody of a child is required, as a threshold matter, to first demonstrate to the trial court either proper cause or a change of circumstances." *Corporan v Henton*, 282 Mich App 599, 603; 766 NW2d 903 (2009).

This Court has held that "to establish a 'proper cause' necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground for legal action to be taken by the trial court." *Vodvarka v Grasmeyer*, 259 Mich App 499, 512; 675 NW2d 847 (2003). An "appropriate ground" is typically "relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being." *Id.* Yet not every change relevant to a best-interest factor will be an appropriate ground to revisit a custody order—"the evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child." *Id.* at 513-514. Further, the change relevant to this determination "must have occurred *after* entry of the last custody order." *Id.* at 513.

The trial court issued a written opinion and order finding defendant had proven by a preponderance of the evidence proper cause or a change of circumstances warranting a review of the previous custody order. As required, the court's decision referenced the statutory best-interest factors, specifically factors MCL 722.23(g), (h), and (j). Plaintiff argues that the trial court's analysis of the best-interest factors is too cursory—that it merely cites the factors without providing any factual analysis. This is incorrect. Relevant to its conclusion in the opinion and order, the trial court made the following factual observations:

> Despite [the April 2019 stipulated custody order], the parties have continued to demonstrate an inability to cooperatively co-parent and each have made serious allegations as reflected in multiple filings that the other parent is engaging in conduct that is alienating and harmful to the minor children. And each alleges that the other is non-compliant with the Consent Custody Order to the detriment of the

minor children's well-being. Since entry of the Consent Order, [V]S has disclosed that []he identifies as male and wishes to be referred to by male pronouns . . . . Since December 2019, parenting time between VS and [plaintiff] has been limited to contact by telephone or virtual calls following a hearing held on August 31, 2020. The conflict between these parents negatively impacts LS and KS[4] as well and include, but are not limited to, issues regarding soccer, football, school choice, swim clubs, transportation, extracurricular activities, vacation, payments of therapy and expenses of the minor children. Concerns have also been raised about the children's mental health status and treatment needs.

Thus, plaintiff's contention that the trial court abused its discretion by summarily citing statutory best-interest factors is not supported by the record and does not warrant reversal.

Next, plaintiff argues that the trial court improperly measured proper cause or a change of circumstances from the April 2019 custody order instead of either the September 2020 or October 2020 orders. Had the court done so, plaintiff insists, it would have determined that there had been no changes warranting a review of the custody order. For plaintiff's argument to be successful, she would have to be correct that either the September 9, 2020 order or the October 5, 2020 order is a "custody order" as contemplated in MCL 722.27(1)(c), such that they are the last custody order from which a change in circumstances is to be measured. See *Vodvarka*, 259 Mich App at 513

As it pertains to this appeal, it is only the custody of KDS and LAS still at issue. This is important because, although the September 9, 2020 order temporarily changed parenting time for VS, neither of the orders did so for KDS and LAS. The September 9, 2020 order contained an array of terms, but none of them modified custody. Indeed, only one of the terms related to LAS, and it merely verified that he was to attend Farmington High School (where he was already enrolled) until the trial court could hold a hearing. Before and after the order, plaintiff and defendant shared physical and legal custody, and they had equal parenting time with each child.

The October 5, 2020 order similarly did not change or generally address custody. That order addressed the pending dispute over which high school LAS would attend. Again, both before and after the order, defendant and plaintiff shared physical and legal custody of LAS and had equal parenting time.

In the simplest terms, neither the September 2020 nor the October 2020 order was a "custody order" from which to measure proper cause or a change of circumstances. While the orders related to the parties' exercise of their shared legal custody, it did not address whether shared custody was still appropriate. Thus, for purposes of the analysis regarding proper cause or a change of circumstances, the trial court correctly determined that the previous custody order was the April 2019 stipulated custody order, which systematically modified the custody provisions in the CJOD.

---

[4] The trial court refers to LAS as "LS," and KDS as "KS." To avoid confusion by consistently adding brackets when quoting the trial court, we will leave "LS" and "KS" as is when quoting the lower court.

Plaintiff persists that the trial court's proper-cause determination could not have been on the basis of sufficient facts because its opinion and order was issued only one day into the evidentiary hearing. This argument lacks merit for at least two reasons. First, under the Child Custody Act, the Legislature specifically contemplated that a decision regarding proper cause or a change of circumstances could occur *before* an evidentiary hearing related to changing custody. See MCL 722.27(1)(c); *Corporan*, 282 Mich App at 603 ("[A] party seeking a change in the custody of a child is required, as a threshold matter, to first demonstrate to the trial court either proper cause or a change of circumstances."). Therefore, the trial court's decision to issue its opinion regarding proper cause or change of circumstances before completion of the evidentiary hearing was not error as alleged by plaintiff.

Second, plaintiff's argument ignores that the trial court took take judicial notice of the entire lower court file before issuing its opinion. The file included, among other things, the many recommendations and reports issued by Parenting Coordinator Wolfson. From this evidence, the trial court could meaningfully determine whether there had been proper cause or a change of circumstances warranting a review of the previous custody order. Even without judicial notice of the lower court file, the trial court had heard testimony of the GAL on the first day of the evidentiary hearing, who explained how plaintiff acted in a manner that could potentially cause significant harm to the minor children. The GAL asserted that plaintiff told KDS, while LAS could overhear, that if KDS continued to watch anime, he would become like VS. As the GAL recognized while testifying, this statement from plaintiff was damaging to all three of the children directly, and could detrimentally affect the relationships between the children. Consequently, and as will be discussed in greater detail below, the trial court had more than adequate evidence from which it could determine whether there had been proper cause or a change of circumstances warranting a review of the previous custody order when it issued the contested opinion and order.

Lastly, plaintiff contends that the trial court improperly relied on everyday changes in the children's lives to find proper cause or a change of circumstances. In support of her argument, plaintiff focuses on the trial court's reference to "issues regarding soccer, football, school choice, swim clubs, transportation, extracurricular activities, [and] vacation . . . ." This ignores that the trial court's reference to at least some of these activities concerned serious allegations against plaintiff. For example, with respect to LAS's school choice, there was evidence that plaintiff threatened to no longer have a relationship with LAS if he chose to go to Farmington High School instead of Franklin High School, where plaintiff wanted him to attend. Further, the trial court knew from Parenting Coordinator Wolfson's many recommendations that plaintiff's interference with all of the children's listed activities appeared to be part of a systemic effort to alienate the children from defendant. Considering the trial court's reference to MCL 722.23(h) in the order, which relates to the parties' ability to encourage a relationship with the other parent, plaintiff's isolation scheme was the trial court's actual concern. Plaintiff's behavior showed that she was willing to harm the interests of her children to cause problems for defendant, which was a significant concern far beyond normal life changes.

Plaintiff's argument also ignores the trial court's reference to "payments of therapy and expenses of the minor children," and that "[c]oncerns have also been raised about the children's mental health status and treatment needs." The record showed that plaintiff stopped paying the bills of Parenting Coordinator Wolfson and the children's individual therapist, Dr. John Cotter. This risked Dr. Cotter or Parenting Coordinator Wolfson removing themselves from the case,

-10-

which would have been detrimental to the children's health and well-being. Plaintiff also showed questionable judgment regarding KDS wearing a medical bracelet related to his seizures. While plaintiff insists that a doctor never specifically stated KDS *had* to wear the bracelet, her argument misses the point. Defendant testified that a neurologist told him it would be wise for KDS to wear the bracelet because, if he had a seizure while his parents were not around, first responders would need the information. Although KDS was not ordered by a doctor to wear the bracelet, it was a simple way to protect KDS's health. For reasons never explained, plaintiff believed that KDS should only have to wear the bracelet if a doctor specifically ordered it. She either cannot or will not acknowledge that the burden of the bracelet on KDS was minuscule compared to the benefit it could have offered if he had another seizure. Once again, the trial court was aware that plaintiff was putting her battle against defendant over the best interests of her children.

In sum, plaintiff threatening to discontinue her relationship with LAS if he decided to go to Farmington High School, failing to pay the children's mental-health-care providers, engaging in a scheme to try to sabotage defendant's relationship with the children, and disregarding a medical suggestion about KDS's seizures went well beyond "the normal life changes (both good and bad) that occur during the life of a child, and" there was "evidence that the material changes have had or will almost certainly have an effect on the child." *Vodvarka*, 259 Mich App at 513-514. The trial court's finding of proper cause or a change of circumstances warranting review of the April 2019 custody order was therefore not against the great weight of the evidence.

## V. ESTABLISHED CUSTODIAL ENVIRONMENT

Plaintiff next contends that the trial court committed error requiring reversal when analyzing the established custodial environment of the children. We disagree.

This Court, in *Griffin v Griffin*, 323 Mich App 110, 118-120; 916 NW2d 292 (2018), recently provided a summary of the relevant law related to the importance of determining the existence of an established custodial environment:

> When a parent moves for a change of custody, he or she must first establish that there is a change of circumstances or proper cause to revisit the custody decision. If that threshold is satisfied, the trial court must determine whether the child has an established custodial environment. Where no established custodial environment exists, the trial court may change custody if it finds, by a preponderance of the evidence, that the change would be in the child's best interests. However, where an established custodial environment does exist, a court is not to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. Stated differently, to determine the best interests of the children in child custody cases, a trial court must consider all the factors delineated in MCL 722.23(a)-(l) applying the proper burden of proof, and the proper burden of proof is based on whether or not there is an established custodial environment. [Quotation marks, citations, brackets, and footnotes omitted.]

-11-

"The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c).

The trial court concluded that LAS and KDS had an established custodial environment with both parents. As such, defendant's motion to change their physical custody would affect the children's established custodial environment with plaintiff, making the appropriate burden of proof clear and convincing evidence.

On appeal, plaintiff insists that the trial court's analysis of the children's established custodial environment was not detailed enough and did not identify specific facts related to the court's conclusion. Even if true, however, it is not grounds for reversal. In *Kubicki v Sharpe*, 306 Mich App 525, 540-541; 858 NW2d 57 (2014), this Court considered a case in which the lower court "failed to articulate any findings specifically identifying [the minor child]'s established custodial environment," but nevertheless applied the highest burden of proof available—clear and convincing evidence. The *Kubicki* Court concluded that any error in the lower court's analysis of the child's established custodial environment was harmless because the court applied "the highest standard of proof applicable to custody proceedings . . . ." *Id*. at 541. Like in *Kubicki*, any error in the trial court's analysis of the children's established custodial environment was harmless because the trial court applied the clear-and-convincing-evidence standard to defendant's custody motion with respect to LAS and KDS.

## VI. BEST INTERESTS OF THE CHILDREN

Plaintiff argues that the trial court abused its discretion by amending the custody order and made findings that were against the great weight of the evidence with respect to best-interest factors MCL 722.23(a), (c), (e), (f), (h), (j), and (k). We disagree.

## A. STANDARD OF REVIEW

The standards of review for all custody decisions, as discussed in Section IV.A. of this opinion, also apply here. To whom custody should be awarded is a discretionary ruling reviewed for a palpable abuse of discretion. *Dailey*, 291 Mich App at 664.

## B. LAW AND ANALYSIS

"A trial court must consider the factors outlined in MCL 722.23 in determining a custody arrangement in the best interests of the children involved." *Bofysil v Bofysil*, 332 Mich App 232, 244; 956 NW2d 544 (2020). MCL 722.23 provides:

As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

-12-

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

When rendering a custody determination, "the finder of fact must state his or her factual findings and conclusions under each best interest factor." *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 451-452; 705 NW2d 144 (2005). If a particular factor is irrelevant to that determination, the fact finder "need not make substantive factual findings concerning the factor" and need only state on the record its conclusion that the factor is irrelevant. *Pierron*, 486 Mich at 91. When a factor is relevant, the factfinder's "findings and conclusions [on that factor] need not include consideration of every piece of evidence entered and argument raised by the parties," but "the record must be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings." *MacIntyre*, 267 Mich App at 452. "In reviewing the findings, this Court defers to the trial court's determination of credibility." *Berger v Berger*, 277 Mich App 700, 707; 747 NW2d 336 (2008) (quotation marks and citation omitted).

## 1. FACTOR (A)

The first factor at issue requires consideration of "[t]he love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). The trial court found this factor weighed in favor of defendant for both KDS and LAS.

As to LAS, the trial court found LAS's emotional bond with defendant was stronger than that with plaintiff. The court also noted LAS's "number one priority is soccer." The court believed LAS "used soccer as an escape from the turmoil that exists within his family, specifically, the ongoing struggle between his parents." The court found that, while defendant has supported LAS's participation in soccer, plaintiff threatened it. According to the trial court, plaintiff's "behavior and attitude toward soccer has threatened the one thing that has provided LS with comfort over these difficult years and as a result, his emotional connection with her has deteriorated." As an example, an order was issued providing that defendant was to drive LAS to all soccer-related events. Despite the clearly worded order, plaintiff repeatedly tried to interfere with LAS's transportation to soccer. This was a problem not only because it violated an order of the court, but because LAS expressed concern over plaintiff's involvement and "[did] not trust that she [would] get him [to soccer-related events] on time or refrain from trying to pick him up early." The trial court ultimately determined that the biggest threat to LAS's continued enjoyment of soccer was plaintiff's interference. Further, plaintiff's threats to LAS extended beyond soccer, like when she told LAS she might discontinue their mother-child relationship if he chose to go to Farmington High School. In contrast, the trial court found defendant "has demonstrated that he loves and supports LS consistently and LS depends on his father's support to ensure that his needs are met unconditionally." Thus, the trial court found factor (a) to favor defendant as it pertained to LAS.

Plaintiff argues that this finding was against the great weight of the evidence because the trial court incorrectly found her to have harmed her bond with LAS by asking to drive him to soccer practices. Plaintiff's assertion misconstrues the record. The trial court highlighted plaintiff's insistence on driving LAS to soccer to emphasize plaintiff's willingness to ignore a court order, and found that LAS was concerned about plaintiff driving him because she often brought him to soccer-related events late or picked him up early. LAS's worries in this regard were documented in the record. The trial court's determination was not that plaintiff was a bad mother because she wanted to drive LAS to practice, but that plaintiff inadvertently harmed her bond with LAS by threatening his passion in contravention of a court order.

Plaintiff further argues that the trial court improperly found that she threatened her relationship with LAS if he chose to go to Farmington High School. The threat made by plaintiff was recounted in Parenting Coordinator Wolfson's February 2020 recommendation regarding LAS's school choice, which was admitted as evidence during the evidentiary hearing. The trial court, as is clear from its opinion, believed the evidence, and plaintiff has not provided a persuasive reason for us to revisit the trial court's credibility determination. *Berger*, 277 Mich App at 707. Moreover, the argument presented by plaintiff is essentially that, because she still has a relationship with LAS even though he attends Farmington High School, she must not have made the threat. The trial court never found that plaintiff *meant* the threat, only that she made it and that it was harmful to her relationship with LAS. Accordingly, plaintiff's argument on this point lacks merit.

-14-

Turning to KDS, the trial court began by opining that it was "convinced that KS has a healthier emotional bond with Father at this time but testimony established that he is bonded with his mother as well." The trial court explained its decision in the following manner:

[T]here is little doubt that Mother's conduct and feelings towards Father has an ongoing negative impact on KS's relationship with this father. KS's relationship with Mother is complicated and has been strained and his bond with her has suffered as a result. This youngest child is under immense stress and he has residual anger toward Father as well; much of it rooted in misrepresentations made by Mother about Father to the children. KS has struggled to reconcile this in his mind. KS was described as a child who is triangulated and who wants to please both of his parents. He is a child who vacillates between seeming to align with Mother or with Father and [Zopf]; but can never align with both at the same time. He is a child caught in between. KS engages in outbursts of anger and rage toward Father and Step-Mother especially after being with Mother or speaking with Mother on the phone.

KS desires to have a strong relationship with Mother and in fact [Parenting Coordinator] Wolfson testified that he likely would choose to live with Mother if given the choice. However, Mother displays a lack of consistent and unconditional support for KS when it comes to important issues such as proper treatment for KS's seizure disorder, KS's need for academic tutoring, the issue associated with his sleep study, and the statements Mother has made about KS watching anime, specifically that watching anime will make him transition like his brother. All of this has a cumulative negative impact on KS and as he gets older and understands more, his ability to have a secure emotional bond with Mother is unlikely.

Mother is unpredictable and as described in testimony, "can't be stopped." Mother's pattern of conduct and the difficulties or interruptions that Mother inserts into KS's daily life have further eroded KS's ability to be able to feel safely and securely bonded to Mother. She causes chaos in his life that it not healthy or in KS's best interest. Mother is engaged in conduct that is alienating and the evidence established that KS is confused and that his treatment of Father and [Zopf] is negatively impacted when he has contact with Mother. Given the disclosures by VS's description of being "brainwashed" and told false stories about his father by Mother that negatively impacted his view of his father and their relationship, the Court concludes that KS is experiencing these same dynamics with the same negative results.

Conversely, Father is aware of the pressures and stress that KS is experiencing and is focused on protecting him and helping him overcome his emotional distress. Father supports KS's medical and educational needs and provides stability for him generally.

Factor (a) favors Father as it pertains to KS.

Plaintiff first takes issue with the trial court's finding related to KDS's seizures. The trial court found that KDS's bond with plaintiff was weakened by her reaction in response to his seizures. Plaintiff contends that KDS never had a seizure disorder so her objection to his wearing the medical bracelet was valid, and that the trial court must have ignored this fact when reaching its decision. Plaintiff is incorrect. The trial court did not find that KDS should have worn the bracelet because he had a seizure disorder. Rather, as plaintiff tacitly admits in her brief on appeal, there was a time period when the parties and KDS's doctors were unsure if KDS had a seizure disorder, and so, as a precaution, KDS's neurologist and defendant thought KDS should wear a medical bracelet to warn first responders in the event KDS had another seizure. The minimal imposition on KDS did not outweigh the benefit if KDS turned out to have a seizure disorder and had another seizure when his parents were not around. Moreover, the trial court's finding was also in relation to KDS feeling like he had to do his best to appease both parents; during the evidentiary hearing, the record established that KDS did not mind wearing the bracelet when with defendant, but claimed he did not like it and took it off when around plaintiff. This showed an unhealthy bond between KDS and plaintiff, as KDS was willing to buck the safest practices to ensure he kept plaintiff happy. Plaintiff, as the adult, should have been the one tailoring her behaviors to care for KDS. Her inability to understand this, as recognized by the trial court, exhibited the impropriety of her relationship with KDS. This finding was not against the great weight of the evidence, even though KDS was eventually diagnosed as not having a seizure disorder.

Plaintiff also argues that the trial court ignored the fact that defendant removed KDS from participating in Cub Scouts, which she contends caused upheaval in KDS's life and harmed his bond with defendant. The record does not support plaintiff's contentions. The recommendation regarding this issue given by Parenting Coordinator Wolfson did not require that KDS be removed from Cub Scouts, but that he switch packs to a location more central between plaintiff and defendant. The recommendation also required plaintiff to no longer be the den leader. Thus, there was no evidence that defendant removed KDS from participating in Cub Scouts. We note, however, that even if there was such evidence, the trial court's failure to consider it would not be reversable error because the court did not need to address "every piece of evidence" when rendering its decision. *MacIntyre*, 267 Mich App at 452[5]

Lastly, plaintiff contends that the trial court's finding that plaintiff made the comment regarding anime turning KDS into VS was against the great weight of the evidence. For this argument, plaintiff relies on her denial of making the statement, her prior support of the children watching anime, and her explanation that she only put limits on overtly sexual and violent forms of anime. Although these contentions from plaintiff certainly were admitted during the evidentiary hearing, the trial court was not required to believe them. The trial court instead credited the GAL, who testified that after meeting with KDS and LAS, he was convinced that plaintiff made the

---

[5] We also note that, to the extent plaintiff seems to claim that the trial court punished her for causing issues with KDS's tennis when defendant did the same with respect to KDS's Cub Scouts, that argument also lacks merit. The trial court made no specific findings related to tennis under factor (a), which was permissible as the court was not required to "include consideration of every piece of evidence entered and argument raised by the parties." *MacIntyre*, 267 Mich App at 452.

statement at issue. This Court generally defers to the trial court's determinations of credibility, *Berger*, 277 Mich App at 707, and plaintiff has offered no persuasive reason to diverge from this general rule.[6] Accordingly, neither the trial court's finding that plaintiff made the at-issue statement nor its overall finding that factor (a) favored defendant as related to LAS and KDS was against the great weight of the evidence.

## 2. FACTOR (C)

The next factor challenged by plaintiff is factor (c), which relates to "[t]he capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The trial court made the following findings regarding this factor:

> Neither party pays the other child support. The 4/23/2019 Stipulated Order directed that a Uniform Child Support be entered for zero support to be paid by either party and that all prior claims for reimbursement of support, extra-curricular activities, medical expenses, or anything else related to the children was waived to zero as of the entry of the 4/23/2019 Stipulated Order. If the [Michigan Child Support Formula (MCSF)] was applied, Mother would be paying Father monthly child support.

> Mother is employed as a special education teacher at Franklin High School in the Livonia School District and earns approximately $93,000 annually. However, she testified that her household budget runs in the negative each month. Mother provides health care coverage for the minor children through her employer. Mother testified that she has spent between $150,000 and $160,000 dollars on this litigation.

> Father has a bachelor's degree in physical and health education and he has coaching certifications as well. Father previously worked for the University of Detroit Mercy Jesuit High School and he has held other jobs since then as well. Father and his wife have mutually agreed that he will not work outside of the home at this time; rather, he is the "house manager," managing the household and the six children who comprise this blended family. Father's wife, Ms. Zopf, earns sufficient income to provide for all of their needs, including housing, food, clothing, and all other needs for their combined six children. Father was previously employed and if it became necessary, he is employable. Father has spent approximately $100,000 dollars on this litigation.

---

[6] To any extent that plaintiff takes issue with the trial court's failure to specifically reference and address any of plaintiff's testimony or arguments, the court was not required to do so. *MacIntyre*, 267 Mich App at 452.

-17-

As explained above, Mother arranged for the children to receive free school lunches allegedly due to financial hardship, but the children were only receiving free lunch during Mother's parenting time.

Mother's lack of cooperation with providing necessary medical care or treatment for the children [sic]. Examples include, but are not limited to her refusal to allow KS to wear a medical alert bracelet for his seizure disorder during her parenting time, even when taking KS on trips to Cedar Point where, in fact, KS had a seizure [before]; Mother's failure to follow the agreed upon protocol for KS's sleep study despite KS experiencing difficulty during the sleep study that Father was not made aware of until after the fact; and Mother's refusal to participate in, or consent to much needed psychological and psychiatric treatment for VS. Mother interfered with VS's access to necessary psychiatric care which caused significant and harmful delays to VS. Mother has failed to support and reasonably cooperate with the services that VS is receiving through the University of Michigan Transgender Services Clinic. VS had an appointment with the Clinic in June of 2021, and Mother refused the FaceTime appointment option, but then showed up late for the in-person appointment. During the appointment, Mother cried and focused her questions on superficial concerns such as VS's hands, breasts, genital anatomy, and what would happen to VS if put in jail. All of these questions were asked in front of VS, which left him feeling upset and defeated. The appointment ended early after Mother inquired about VS going to jail, and the parties were informed that they would be reassigned to a social worker.

While plaintiff should have the financial capacity to provide for her children, she does not reasonably have the disposition. The approximately five-month delay in providing critical mental health treatment and care for VS was extremely detrimental to his overall health and wellness. Mother engages in obstructionist tactics which causes unnecessary delays which has had a demonstrative direct negative impact on the children's physical, mental and emotional wellness.

Mother has refused to provide health insurance information to some of the medical providers for the children, failed to reimburse Father, and she has failed to pay [Parenting Coordinator Wolfson] and Dr. Cotter in accord with governing orders and in accord with the office policies of theses providers. [Parenting Coordinator] Wolfson testified that she believes that Mother is refusing to pay her so that she requests to be released as the [parenting coordinator].

Father meets the children's needs including ensuring they receive his unconditional support in all areas of their lives. He has forfeited employment outside of the home to be available for them. He has demonstrated that he supports their desires, goals and needs by his words and conduct.

Factor (c) favors Father as it pertains to VS, LS and KS.

-18-

In arguing that the trial court's factual findings for this factor were against the great weight of the evidence, plaintiff implies that this factor should favor her because she is gainfully employed while defendant is not. The record shows that defendant is supported by his wife, Zopf, who works as an attorney. The trial court believed Zopf's and defendant's testimony that Zopf made sufficient money to support the family and ensure the children have everything they need to thrive. The trial court's decision to believe this testimony was not against the great weight of the evidence, especially in light of the lower court file, which showed that defendant paid all of the children's extracurricular and sport fees, paid Parenting Coordinator Wolfson's charges, and was up-to-date with Dr. Cotter's bills. Although defendant was not employed at the time of hearing, factor (c) does not specifically reference having wages, but merely the "capacity and disposition" to provide for the children. MCL 722.23(c). Thus, defendant's lack of a job does not mean factor (c) could not weigh in his favor.

As with the previous factor, plaintiff also challenges the trial court's finding related to KDS's seizures and wearing a bracelet. Pertinently, she again insists that her obstinance related to wearing the bracelet should not weigh against her because KDS was eventually cleared from having a seizure disorder. For the reasons discussed above, this argument lacks merit.

Lastly, plaintiff contends that the trial court's finding about the reasons for the delay with VS's psychiatric care was against the great weight of the evidence because the record shows that plaintiff did her best to get prompt psychiatric care for VS.[7] Plaintiff is correct to the extent that the record shows she unilaterally contacted two different psychiatrists for VS's treatment. Problematically, both providers refused to work with Parenting Coordinator Wolfson and Dr. Cotter, and so they were not suitable to provide care for VS because this was one of the requirements agreed upon for VS's treatment. Thus, instead of proving that plaintiff did not delay VS's psychiatric treatment, these facts show the opposite: if plaintiff had worked with Parenting Coordinator Wolfson, Dr. Cotter, and defendant before deciding on a psychiatrist (like she was court-ordered to do), then the problems with her chosen providers could have been discovered before time was spent scheduling and attending evaluations.

Regardless, the trial court's finding was supported by testimony from Parenting Coordinator Wolfson and defendant that plaintiff was the sole cause of the delay in finding a psychiatrist for VS. The eventual provider chosen for VS—Dr. Brooke Weingarden—was initially scheduled to meet with VS on January 30, 2020. Plaintiff, however, contacted Dr. Weingarden's office on the morning of the appointment and demanded that it be canceled. The record supports that plaintiff then refused to work with any child psychiatrist who had ever had a professional relationship with Zopf, which, while perhaps understandable, certainly caused a delay in finding VS a suitable provider. Plaintiff insisted on this term regardless of whether the proposed psychiatrists had a close relationship with Zopf or had some reason to be biased in her favor. This was not only exhibitive of the delay caused by plaintiff, but an example of her choosing her

---

[7] Although VS is no longer subject to the custody order, the trial court relied on plaintiff's delay with respect to VS's treatment to support of its finding that plaintiff generally disregarded her children's medical best interests in favor of her desire to antagonize defendant. Thus, this issue still is relevant to this appeal.

vendettas over the best interests of her children. The trial court decided to believe Parenting Coordinator Wolfson's and defendant's testimony over plaintiff's claims, and we have no reason to second guess that decision on appeal. *Berger*, 277 Mich App at 707.

In sum, the record supported the trial court's findings that defendant had the capacity and disposition to support his children, while plaintiff had the capacity but not the disposition to do so. MCL 722.23(c). Plaintiff has not identified any findings by the trial court that were against the great weight of the evidence, and, therefore, the trial court did not err in weighing factor (c) in favor of defendant.

### 3. FACTOR (E)

Plaintiff also challenges factor (e), which considers "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes," MCL 722.23(e). The trial court provided the following reasoning for its decision to weigh factor (e) in favor of defendant:

This factor favors a parent who has a stable home.

. . . Mother and Father both have a "stable home" in that they have resided in their physical home for some time. Both Mother and Father have extended family nearby. There was significant testimony surrounding behavior of Mother's family member or members and VS transitioning to male. It was alleged that Mother's father sent VS photos of him as a young "girl" with statements that VS as a young "girl" was missed by the family. Naturally, this was extremely upsetting to VS. When the GAL was presented with this information and questioned Mother about it, she focused on trying to convince [the GAL] that the man who did this was not her father, but some other older man in the family. Mother was more concerned with correcting who sent the photos than with the possible harm that sending the photos to VS could cause. In any case, it sent the message to VS that Mother's extended family was also not supportive of his transition to male. This was very hurtful and upsetting to VS and Mother simply could not see the harm.

Mother has persisted in alleging that Father assaulted her mother in 2015. Again, Mother's allegations have not been substantiated. In consideration of both the lack of evidence and mother's general lack of credibility with the Court, these allegations will not be considered in the Court's analysis as it pertains to Father.

KS disclosed that he believes this happened and testimony established that this information has damaged his view of his father. Mother's family appears to support her and her views that [Parenting Coordinator Wolfson], the GAL, [defendant,] and [Zopf] are working with the Court against her to kidnap her children. Mother testified that she is in the negative financially every month and that she has spent approximately $150,000-160,000 dollars in attorney fees. Mother signed the children up for free lunch citing financial hardship and she has large debts owed to [Parenting Coordinator Wolfson] and Dr. Cotter.

Father married Ms. Zopf in 2019 and they have "blended" families, with Ms. Zopf bringing three children into the family from her prior marriage and Father

with his three children. All six children are fairly similar in age. They all reside together in a single-family home. Ms. Zopf testified that all of the children have a good relationship. Father and his wife jointly decided that Father would stay home and manage the household and the children's needs while Ms. Zopf maintains her law practice.

Father testified that he is estranged from his father.

Factor (e) favors Father as it pertains to VS, LS and KS.

Plaintiff insists that the trial court's decision to weigh this factor in favor defendant was against the great weight of the evidence because the trial court erred when finding that defendant had extended family close by. After reviewing the entire record, there appears to be no testimony supporting this finding by the trial court. Consequently, this particular finding of fact was against the great weight of the evidence.

Even so, the trial court's decision to weigh this factor in favor of defendant was not against the great weight of the evidence. It is abundantly clear from the trial court's remaining reasoning that the proximity of extended family members was not instrumental to its finding regarding factor (e). Instead, the trial court focused on defendant's nuclear family unit, which included defendant, Zopf, her three children, and defendant's three children. The record supported the trial court's finding that defendant and Zopf had a strong, supportive, and permanent family unit. They were married and lived together in a single-family home. The trial court's bare reference to defendant's extended family does not undermine the trial court's overall finding of factor (e) being in favor of defendant. Leaving out the improper fact-finding, the trial court's determination regarding factor (e) still does not "clearly preponderate in the opposite direction," and thus, was not against the great weight of the evidence. *Pennington*, 329 Mich App at 570.

Plaintiff also challenges the trial court's finding related to the photographs sent to VS by someone associated with plaintiff's family. As she did when the issue was first raised, she focuses on her purported lack of a familial relationship with the man who sent the e-mail and photographs. Like the first time she raised this issue, plaintiff's precise relationship with the man who sent the e-mail is of little importance. There is no dispute that the man in question knew VS through plaintiff's family, even if he was not directly related.

Plaintiff otherwise protests that the email had nothing to do with VS's transition. Yet VS received the e-mail with photographs of him dressed as a young girl, and a statement from the person claiming they missed the little girl, shortly after VS announced he was male. Plaintiff would have the trial court and this Court believe that this was an unfortunate coincidence, but the trial court refused to find such. Considering the timing and content of the e-mail, along with the person's association with plaintiff's family and plaintiff's general resistance to VS transitioning, the trial court's finding regarding this fact was not against the great weight of the evidence.

## 4. FACTOR (F)

Next, plaintiff argues that the trial court erred by weighing factor (f), which relates to "[t]he moral fitness of the parties involved," in favor of defendant. MCL 722.23(f). For this factor, the trial court reasoned:

With this factor, the Court is concerned with Mother's dishonesty and how her dishonesty has been used to alienate the children from their father. VS shared with [Parenting Coordinator] Wolfson that Mother told him things about Father, which in turn caused VS to be rude to Father and Step-Mother during his parenting time. VS is angry about being told things about his father that weren't true and about how it caused him to have a very limited and strained relationship with Father during those years.

The Court is also concerned because Mother's dishonesty has made any efforts at resolving disputes and moving forward with just about anything in this case exceedingly difficult, if not impossible. Mother will make agreements, but then doesn't keep them and often lies about it.

Both of these consequences of Mother's dishonesty have harmed the children and certainly the harm expands well beyond what can be described here. But there is sufficient evidence to support a finding that Mother has caused significant delays in allowing necessary services and completing tasks for the benefit of the minor children and that she has filed numerous objections, most without merit. The fact that it takes a "slew" of professionals working in concert to get anything accomplished for these children due to Mother's actions, has been extremely harmful and is not a sustainable option for this family going forward.

The record supports a finding that Mother's conduct and her ability to parent is negatively implicated in this factor. Her conduct time and time again has negatively impacted the children. One example of how her moral conduct directly and negatively impaired her ability to parent occurred when she purchased the coded bracelet for VS's birthday present. Mother took KS on the shopping trip for the bracelet and when he later learned of coded word associated with the bracelet he was upset that he, rather than his mother hurt his brother.

Mother continues to make allegations that Father abused her and the children, in the presence of the children at medical appointments and insists that examination room doors are left open because of her fear of Father. These allegations have never been substantiated. Testimony established the negative reaction that the children have when she engages in this conduct but that doesn't prevent her from refraining from the conduct [sic]. [Parenting Coordinator Wolfson] testified that Father was in need of trauma therapy because of these allegations. These children have been subjected to hearing their mother repeatedly insist that their father is an abuser and that in fact have been abused by him.

The record supports a finding that Mother continues to engage in alienating conduct and that it is currently having a direct and negative impact especially on KS who displays aggressive behaviors towards Father and [Zopf] after having contact with Mother and who then is very remorseful.

Mother has rejected VS and she has threatened to not maintain a relationship with LS because his choice of high schools didn't align with her desire for him to

attend the school she teaches at. She has inserted delays, lies, deceit, and chaos into the children's lives to the detriment of their physical, mental and emotional health.

There is nothing in the record that implicates Father negatively under this factor.

Factor (f) favors Father as it pertains to VS, LS and KS.

In arguing that the trial court's findings for this factor were against the great weight of the evidence, plaintiff begins by reiterating her claims relating to the GAL's testimony about plaintiff telling KDS that watching anime would turn him into VS. As is clear from the trial court's analysis of factor (f), it did not rely on the anime statements for its decision. Consequently, this argument lacks merit. Moreover, plaintiff's arguments with respect to this issue were addressed above, and found to have lacked merit. As a result, plaintiff's argument would not be successful even if the court had relied on plaintiff's contested statement.

Plaintiff next claims that the trial court's finding that she lied about previous abuse was against the great weight of the evidence. For this argument, plaintiff relies heavily on an alleged personal protection order (PPO) entered near the beginning of this case. She suggests that the trial court ignored this fact, which clearly supported the allegations of abuse. While the trial court did enter a temporary restraining order (TRO) in which it ordered "that neither party may scream at, strike, or use physical discipline on the minor children," there were never any findings by the trial court that either parent had engaged in any domestic violence towards each other or the children. Following entry of the TRO, the court entered a "Stipulated Order Restraining Conduct," in which defendant was commanded not to "threaten, harass, injure or otherwise assault" plaintiff. This, again, was not a finding that defendant had previously engaged in such conduct. By simply promising not to assault plaintiff in any manner, defendant was not admitting he had done so in the past, and nothing supports that the trial court otherwise made such findings. As a result, the existence of the "PPO" did not amount to determinative (or even terribly convincing) proof that plaintiff was not lying about her allegations of abuse.

The trial court was permitted to disbelieve plaintiff's testimony about the alleged abuse and believe Parenting Coordinator Wolfson's and defendant's testimony that the abuse did not occur, and plaintiff has provided no reason for this Court to revisit the trial court's credibility determination on appeal. *Berger*, 277 Mich App at 707. To the extent plaintiff suggests that the trial court improperly ignored the PPO, the trial court is not required to "include consideration of every piece of evidence entered and argument raised by the parties." *MacIntyre*, 267 Mich App at 452. Consequently, the finding at issue was not against the great weight of the evidence.

Plaintiff finally challenges the trial court's findings related to plaintiff delaying care with respect to VS's need for a psychiatrist and KDS's seizures. As discussed above, the factual record supports the trial court's finding that plaintiff was at fault for both delays, and KDS's eventual diagnosis did not defeat the analysis. For the same reasons, plaintiff's arguments under this factor fail. Accordingly, the trial court's finding that factor (f) weighed in favor of defendant was not against the great weight of the evidence.

## 5. FACTOR (H)

Plaintiff next challenges the trial court's decision to weigh factor (h) in favor of defendant. Under MCL 722.23(h), the trial court was required to consider "[t]he home, school, and community record of the child." The trial gave the following reasoning:

The Court has addressed some issues related to this factor in other factors above, including the fact that all of the children have struggled in school and Mother has not been cooperative with getting the kids the help they need in a timely manner. [Parenting Coordinator] Wolfson has had to issue recommendations regarding these issues, tutoring specifically, despite there being prior orders already in place.

VS and LS both had [individualized education programs (IEPs)] and received IEP progress reports. LS was initially certified as speech and language impaired and later his certification was changed to Specific Learning Disability. LS has exhibited periods of concerning behavior at school which included not turning in homework on time or at all. Father has been concerned that LS was not receiving all of the educational support he could be getting. LS was receiving tutoring.

KS has had a tutor for the last three years and Father has struggled to get Mother to cooperate with paying her share of tutoring. KS began experiencing behavioral changes at school around the time that he started having seizures. Those behavioral changes included sudden outbursts and an inability to remember conduct including when KS either cut or pulled hair from his head in the school bathroom which was witnessed by another student.

* * *

There was disagreement over where LS would attend high school as discussed above. Mother wanted LS to attend Franklin High School where VS attends and where she teaches. Father suggested that LS attend Farmington High School, which was where LS wanted to go. VS supported LS's desire to attend Farmington High School because he feared that LS would have a similar experience that he has had at Franklin with Mother. This ongoing dispute was very upsetting to LS and resulted in [Parenting Coordinator] Wolfson issuing a recommendation for LS to attend Farmington High School. Even though Farmington High School was the school that LS wanted to attend, Mother filed an objection to [Parenting Coordinator] Wolfson's recommendation and Mother told LS that if he attended Farmington High School she would no longer have a relationship with him. [Parenting Coordinator] Wolfson testified that Mother was very angry, upset, and agitated with LS over this issue.

* * *

What this Court has concluded with respect to this factor is that these children need and deserve all the help, encouragement, support, and independence/autonomy in their educational experience and environment as

-24-

possible. Mother's conduct has repeatedly interfered with, obstructed, frustrated, and delayed this from happening.

Factor (h) favors Father as it pertains to VS, LS and KS.

Plaintiff argues that this factor being weighed in favor of defendant was against the great weight of the evidence because the trial court's determination with respect to tutoring was not supported by the record. In support of this argument, plaintiff cites to her own testimony in which she claimed to not need a tutor for the children because she was a teacher, and insists that she should not be required to pay for half of the children's tutoring if she does not need a tutor in her home.

This argument is illustrative of plaintiff's problem in this case. First, she outright ignores that the consent custody agreement she signed in April 2019 unambiguously required her to pay half of the children's tutoring costs. It does not provide an exception related to the location of the tutoring. By refusing to pay half of the tutoring cost, plaintiff was violating a court order. Second, this argument by plaintiff shows that her focus is on obstructing defendant without due consideration of the children. Her argument that she should not be required to pay for the children's tutor because one is not needed when the children are at her home fails to recognize that the children still exist as students in need of assistance when they are not in her presence. KDS and LAS lived with defendant half of the time. He is not a teacher and does not have specialized training to tutor children. Therefore, the children needed a tutor at his home. Instead of focusing on the needs of her children and recognizing her ability to help by paying her share of the tutoring costs, plaintiff's focus was elsewhere. Plaintiff's refusal to pay her share of the tutoring cost did not, in any possible logical manner, help the children. Considering the circumstances, the trial court's findings with respect to these facts was not against the great weight of the evidence.

Next, plaintiff asserts that the trial court's decision to weigh her role in the dispute regarding LAS's attendance at Farmington High School was improper. To support her argument, plaintiff contends that she cannot be considered a bad parent simply because she thought LAS should attend Franklin High School even though he wanted to attend Farmington High School. Once again, plaintiff has misconstrued the trial court's findings. If plaintiff had simply voiced her belief that Franklin High School was a better fit for LAS, this likely would not have been a fact relied on by the trial court. Instead, though, the record showed that plaintiff became upset with LAS when he said he wanted to go to Farmington High School, and that she went so far as to threaten to end her relationship with LAS if he chose to not attend Franklin High School. Accordingly, the trial court's finding that plaintiff's reaction to LAS's preferred school was detrimental to LAS's "home, school, and community record," MCL 722.23(h), was not against the great weight of the evidence.

Plaintiff's final argument regarding factor (h) again relates to KDS's seizures. She insists that she cannot be blamed for any stress or emotional outbursts suffered by KDS as a result of his seizures. This argument misconstrues the trial court's finding. The trial court noted that it was KDS's stress about the parties' disagreement that led to KDS's outburst. As discussed above, this disagreement stemmed from plaintiff's unreasonable objection to KDS wearing a medical bracelet. Considering the record showed that KDS was aware of and struggled to deal with the parties' disputes, plaintiff's decision to create a serious issue out of a potentially lifesaving medical bracelet

is troubling. Plaintiff either cannot or will not recognize how her actions caused KDS's outburst at school, which negatively affected his "home, school, and community record." MCL 722.23(h). The trial court's finding in this respect was not against the great weight of the evidence.

## 6. FACTOR (J)

As to factor (j)—which requires consideration of "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents," MCL 722.23(j)—plaintiff argues that the trial court improperly found it to weigh in favor of defendant. In finding that this factor favored defendant, the trial court reasoned:

> The parties testified that they encourage the children to have a good relationship with the other parent and want the children to have a relationship with the other parent. However, it is clear to this Court that Mother is not being genuine or truthful when she says she encourages the boys to have a good relationship with Father. Rather, it is the opposite. The evidence supports a finding that Mother does not believe that the children can have a healthy relationship with both parents. To this Court it is obvious that she is the parent for whom the children must be aligned with or they will face they face the consequences.

> Mother has engaged in alienating conduct which has damaged the children's relationship with their father and has caused numerous problems for Father and the children. Mother has shared information with the children about alleged domestic violence perpetrated by Father against Mother and maternal grandmother. In the presence of the children, Mother has informed medical providers that Father has sexually abused her and them. [Parenting Coordinator] Wolfson testified that these persistent allegations have traumatized Father and that she referred him to a specialist to work through the trauma which she has observed has helped Father. There is no doubt that the children have also been traumatized by these allegations which have no basis in fact or evidence.

> VS has disclosed that he feels that he was "brainwashed" by Mother. KS is clearly conflicted by information that has been disclosed to him by Mother, including the story about Father assaulting the maternal grandmother. KS has been described as a triangulated child and he engages in challenging behaviors and outbursts of anger especially after parenting time with Mother or even just a phone call with Mother. LS just goes quiet and disengages.

> Ms. Zopf testified that in their home, they encouraged the boys to remember Mother on special occasions, including her birthday and Mother's Day. They also provided the children with the opportunity to buy gifts and cards for Mother, a practice the children no longer engage in because they learned that Mother throws their gifts in the garbage.

> The Court heard testimony about Mother's social media activity which included posts alleging that [Parenting Coordinator] Wolfson was working with

Mother's abuser and his new wife to kidnap and steal her children. Mother testified that she believes that [Parenting Coordinator] Wolfson is biased against her citing that the recommendations she has issued favor Father and [Zopf]. This distorted view is reflective of her inability to co-parent. While Mother testified that she encourages a relationship between the children and Father, it is clear that she lacks that capacity and once again, Mother's words and conduct are at odds.

The evidence supports a finding that that Mother lacks the ability to encourage and foster a loving and healthy parent-child relationship between the children and their father. Nothing she has done thus far would lead the Court to find otherwise. Father, on the other hand, appears to be willing to encourage and foster a loving and healthy parent-child relationship between the children and Mother. [Parenting Coordinator] Wolfson described Father as a rule follower and testified that he just wants to eliminate the chaos for the children. [Parenting Coordinator] Wolfson testified that Father places the needs of the children as a high priority and that he has always complied with [Parenting Coordinator] Wolfson's recommendations and directives, even when he does not agree with the recommendation.

Factor [(j)] favors Father as it pertains to VS, LS and KS.

Plaintiff argues that the trial court's findings were against the great weight of the evidence, but only challenges the trial court's reference to plaintiff's repeated allegations of abuse. Specifically, she contends that the trial court's finding was improper because of the "PPO" entered early in this case. As discussed above, plaintiff's reference to the TRO or stipulated order precluding defendant from engaging in certain conduct is not convincing evidence related to her claims of abuse. Consequently, plaintiff's challenge to factor (j) lacks merit, and the trial court's decision to weigh this factor in favor of defendant was not against the great weight of the evidence.

### 7. FACTOR (K)

Lastly, plaintiff challenges the trial court's findings with respect to factor (k), which considers "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). The trial court determined that factor (k) was inapplicable after reiterating its reasons for not believing plaintiff's claims of domestic violence. Once again, plaintiff relies solely on the purported failure of the trial court to discuss the "PPO" issued in this case. As discussed repeatedly in this analysis, plaintiff's reliance on the TRO or stipulated order precluding certain conduct from defendant is misplaced. The order cited by plaintiff simply does not require concluding that the trial court's finding was against the great weight of the evidence.

In sum, the trial court found that nine factors weighed in favor of defendant, no factors weighed in favor of plaintiff, two factors were inapplicable, and factor (i) (preferences of the children) was considered but not discussed on the record. For the reasons explained, these findings were not against the great weight of the evidence. In light of the fact that nine factors favored defendant while none favored plaintiff, the trial court did not abuse its discretion in determining

that clear and convincing evidence supported awarding sole physical and legal custody in favor of defendant. *Dailey*, 291 Mich App at 664.

## VII. HEARSAY

In her final argument, plaintiff asserts that the GAL's testimony and evidence about her purported statement to KDS that he would "turn into" VS if allowed to watch anime was inadmissible hearsay. We disagree.

## A. STANDARD OF REVIEW

"A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion." *Buchanan v Crisler*, 323 Mich App 163, 175; 922 NW2d 886 (2018). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Keinz*, 290 Mich App at 141.

## B. LAW AND ANALYSIS

As told by the GAL at trial, the GAL first learned of the statement at issue when he was contacted by defendant after KDS and LAS returned from parenting time with plaintiff. Defendant told the GAL that the two children had reported a statement made by plaintiff about anime. The GAL told defendant to bring the two children into his office as soon as possible so he could speak with them individually. During the GAL's conversations with KDS and LAS, the GAL learned that plaintiff had told KDS he could not watch anime anymore because doing so would "turn him into" VS. The GAL testified that KDS was very upset by the comment because it was hurtful to VS. LAS told the GAL that he overheard plaintiff's conversation with KDS about anime and VS. Thus, to summarize, the statement at issue was made to KDS, overheard by LAS, repeated by those two to the GAL, and then discussed in the GAL's testimony. As such, plaintiff insists that the testimony was hearsay-within-hearsay. Plaintiff is incorrect.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). It follows that an out-of-court statement that is not admitted to prove the truth of the matter asserted is not hearsay. *Martin v Martin*, 331 Mich App 224, 241-242; 952 NW2d 530 (2020).

The alleged statement was, in essence, that "if you watch anime you will turn into VS." This statement as testified to by the GAL was plainly not admitted to prove the truth of the matter asserted. Rather, it was offered to show the effect it had on the persons who heard it, which renders the statement non-hearsay. *Martin*, 331 Mich App at 242. More exactly, plaintiff's statement about anime was admitted to show (1) the effect it had on KDS and LAS, (2) plaintiff's inability to understand how her statements can harm her children, and (3) her refusal to encourage a loving and understanding relationship among her children. Plaintiff's analysis on appeal focuses on whether there are applicable hearsay exceptions but fails to address whether her alleged statement was hearsay at all. Consequently, the trial court did not abuse its discretion by admitting the testimony for the reasons explained, and plaintiff's argument on appeal lacks merit.

## VIII.  CONCLUSION

Affirmed.

/s/ Michelle M. Rick
/s/ Colleen A. O'Brien
/s/ Sima G. Patel